753 A.2d 501

**Eddie ADAMSON**

v.

**CORRECTIONAL MEDICAL SERVICES, INC.**

No. 78, Sept. Term, 1999.

Court of Appeals of Maryland.

June 14, 2000.

240

Stephen Z. Meehan, Principal Counsel (David C. Wright, Executive Director, Joseph B. Tetrault, Chief Staff Attorney, Prisoner Rights Information System of Maryland, Inc., on brief), Chestertown, for petitioner.

John A. Bourgeois (Philip M. Andrews of Kramon & Graham, P.A., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL, and HARREL, JJ.

HARRELL, Judge.

Mr. Eddie Adamson, Petitioner, is an inmate in the custody of the Maryland Division of Correction ("DOC") of the Maryland Department of Public Safety and Correctional Services ("the Department") and housed at the Maryland House of Correction in Jessup. On 15 July 1998, he filed suit in the District Court of Maryland sitting in Anne Arundel County against Correctional Medical Services, Inc., Respondent, a private medical provider under contract [1] with the State of Maryland to provide such services to prisoners at the Maryland House of Correction. Petitioner alleged breach of contract and negligence with regard to inadequate medical services and claimed $2,500 in damages. The District Court dismissed the suit holding that Petitioner first had not exhausted administrative remedies mandated by the Prisoner Ligation Act (PLA), Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.), Courts and Judicial Proceedings Article, § 5–1001, et seq.. Petitioner appealed to the Circuit Court for Anne Arundel County. The Circuit Court, also relying on the PLA, granted Respondent's motion to dismiss the appeal.[2] We granted certiorari to consider the following question:

Does the Prisoner Litigation Act, Maryland Code (1974, 1998 Repl.Vol.), Courts and Judicial Proceedings Article, § 5–1001, et seq., require that a prisoner exhaust administrative remedies prior to instituting suit in state court

---

1. The contract between the State and Respondent is not part of the record in this case. Moreover, the record does not disclose when Respondent commenced providing medical services at the Maryland House of Correction. Assuming the truth of Petitioner's averments in his complaint, Respondent was the medical care provider as of at least 29 August 1996 and through 15 July 1998 when suit was filed.

2. Although the Circuit Court's action took this form, we think the effect of the Court's action was to affirm the judgment of the District Court, both courts having relied on precisely the same ground for disposition. See Md. Rule 7–114(a).

against a private corporation that is contracted to provide medical care to prisoners in the custody of the Division of Correction?

We answer in the negative and reverse.

## I.

Petitioner alleged as follows in his *pro se* complaint in the District Court:

Both named defendants [3] at the times relevant to the plaintiffs [sic] claim were under contract with the Maryland Division of Correction to provide comprhensive [sic] health care to Maryland State Inmates as he [sic] plaintiff duly being [ ]3 rd[ ] party beneficiary. From August 29, 1996 until the present time both named defendants in the scope of their offices as Health Care providers have recklessly and negligencly [sic] failed to provide adequate medical care for Plaintiff's painful Anterior crucrate [sic] ligarment [sic] repair of his right knee causing continued pain and suffering after the plaintiff has relentlessly saught [sic] adequate medical care to no avail[.]

On the complaint form, the boxes labeled "contract" and "tort" are checked signaling that Petitioner alleged breach of contract and negligence against Respondent.[4] Petitioner claimed damages in the amount of $2,500. The District Court dismissed Petitioner's complaint on the ground that Petitioner

---

3. In addition to Respondent, E.M.S.A. Correctional Care was named as a Defendant, but appears now not to be a party to this matter.

4. To the extent that Petitioner's complaint in the District Court and his oral argument in the Circuit Court could be construed as seeking judicial direction that he be provided further medical treatment of an unspecified nature, such a claim has been abandoned at this point. The facts presented by the parties in their briefs and at oral argument to this Court relate only to his monetary damage claim for breach of contract and medical malpractice, not to any claim for future medical treatment. We need not decide, therefore, whether a civil action by an inmate that combines allegations of medical malpractice, for which monetary damages alone are sought, with a demand for further treatment presents a different set of claims that, in whole or in part, must endure the PLA administrative exhaustion requirement.

had not exhausted first available administrative remedies before seeking judicial relief, as required by the PLA.

Petitioner, still *pro se,* appealed to the Circuit Court for Anne Arundel County. At the hearing in that court on Respondent's motion to dismiss the appeal, the parties presented a number of documents, including DOC Directives relating its Administrative Review Procedure (ARP) for inmate grievances and correspondence from the Department's Inmate Grievance Office (IGO), a separate agency within the Department, and the State Attorney General's Office. The correspondence emanated from cases unrelated to the present one, but nonetheless were used and relied on by both parties, without objection, to argue for their respective interpretations of the PLA exhaustion requirement. Two letters were authored by the Executive Director of the IGO. One letter, predating the PLA's enactment, was dated 16 July 1992, and the other was dated 20 November 1998. Both IGO letters, addressed to prisoners that apparently had inquired about the proper procedures for filing claims against private contractors similar to Respondent, indicated the IGO would not entertain such complaints. A third letter, dated 27 January 1999, originated from the Office of the State Attorney General. The letter, signed by an Assistant Attorney General, was in response to a request from a judge of the District Court apparently seeking clarification of DOC Directive 185–002, Section IV.C.2 (addressing the ARP), in a different case pending before the District Court of Maryland sitting in Anne Arundel County.[5] The author opined that the DOC's ARP procedure was not available to an inmate asserting negligence against a private medical contractor.

Respondent argued that Petitioner's claim must undergo at least the DOC and perhaps the IGO administrative gauntlet, pursuant to PLA § 5–1001, et seq., before filing a civil action against Respondent in the District or Circuit Court. The court agreed with Respondent and found that Petitioner had

---

5. The judicial recipient of the letter was not the same District Court judge who dismissed Petitioner's claim.

"failed to provide proof that he exhausted the Administrative Remedy Procedure or that, in fact, he exhausted the remedy." The court cited to PLA § 5–1003, et seq., to support its decision.[6]

## II.

▮▮▮▮▮ In reviewing the underlying grant of a motion to dismiss, we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations. *Allied Inv. Corp. v. Jasen,* 354 Md. 547, 555, 731 A.2d 957, 961 (1999); *Stone v. Chicago Title Ins. Co. of Maryland,* 330 Md. 329, 333, 624 A.2d 496, 498 (1993); *Tafflin v. Levitt,* 92 Md.App. 375, 379, 608 A.2d 817, 819 (1992). We have noted that "the facts comprising the cause of action must be pleaded with sufficient specificity. Bald assertions and conclusory statements by the pleader will not suffice." *Bobo v. State,* 346 Md. 706, 708–09, 697 A.2d 1371, 1372 (1997) (citations omitted). In the end, "[d]ismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff." *Bobo,* 346 Md. at 709, 697 A.2d at 1373. *See also Allied Inv. Corp.,* 354 Md. at 555, 731 A.2d at 961. In sum, because we must deem the facts to be true, our task is confined to determining whether the trial court was legally correct in its decision to dismiss. *See Allied Inv. Corp.,* 354 Md. at 555, 731 A.2d at 961; *Bobo,* 346 Md. at 709, 697 A.2d at 1373. With the appellate review standard in mind, we consider the legal issue in this case.

Petitioner, acquiring legal representation following the Circuit Court's ruling, now argues more pointedly that the PLA's administrative exhaustion requirement does not apply to prisoner malpractice claims against private medical providers under contract with the State. He asserts that the PLA

---

6. The only administrative remedy procedure at issue here, as argued by the parties, are those procedures under the umbrella of the DOC and the IGO. Neither party asserts that other administrative remedies may be available to Petitioner.

process was designed only to apply to prisoner grievances regarding conditions of confinement against the State of Maryland, the DOC, and its officials and employees. Petitioner reasons that the purpose of the statute was threefold: to weed out frivolous claims against the State, to conserve judicial resources, and to relieve the burden on the Attorney General of defending an influx of lawsuits filed in state courts following passage of the federal analog to the PLA. He contends that the complaint filed in the District Court does not relate to conditions of his confinement, but rather to an injury (past and ongoing pain and suffering) inflicted by medical treatment or the lack thereof attributable to Respondent. Furthermore, he argues, the PLA was not designed to be used by private contractors as a screening device for prisoner complaints because the available administrative procedures are not equipped to deal with malpractice claims, nor do any such procedures empower the DOC to provide Petitioner with any remedy in the nature of damages.

Respondent presents essentially two arguments why Petitioner must exhaust available administrative remedies before filing a civil action in state court. First, Respondent states that under the principles of statutory construction, coupled with the specific legislative history of the statute involved, the PLA's administrative exhaustion requirement plainly encompasses prisoner malpractice lawsuits filed against private contractors. Respondent focuses in particular on the defined statutory term "civil action," stating:

Four elements comprise the principal definition of "civil action" under the Act. To be a "civil action," an action must be: (1) a legal action (2) seeking money damages, injunctive relief, or any appeal (3) filed in any court in the State (4) that relates to or involves a prisoner's conditions of confinement. *See* § 5-1001(c)(1). Petitioner's actions against [Respondent] in the district court and the circuit court satisfy each of those elements. Petitioner filed his lawsuit against [Respondent] in the district court, then appealed to the circuit court, alleging that [Respondent] "recklessly and negligencly [sic] failed to provide adequate medical care for

the Plaintiff's painful Anterior crucrate ligarment [sic] repair of his right knee...." Plaintiff sought damages of $2,500.00. Certainly this case is a legal action, seeking money damages, filed in a court in this State.

A crux of Respondent's argument lies in its conception of the statutory term "conditions of confinement." It asserts that Petitioner's malpractice claim relates to a "condition of confinement" by referencing Supreme Court jurisprudence and several federal court decisions. It states:

> In *Wilson v. Seiter*, 501 U.S. 294 [111 S.Ct. 2321, 115 L.Ed.2d 271] (1991), for example, the Court held that claims arising from prison-wide deprivations, and deprivation of medical care to an individual prisoner, were actions addressing "conditions of confinement":
>
>> [T]he medical care a prisoner receives is just as much a "condition" of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates.
>
> *Id.* at 303 [111 S.Ct. 2321].
>
> Federal courts have dismissed prisoner lawsuits relating to medical services, construing the [federal Prison Litigation Reform Act] to require prisoners to exhaust all administrative remedies before filing suits relating to "prison conditions."

Respondent then cites several federal court cases [7] to support its proposition and notes that the PLA was enacted in 1997 to complement the Federal Prison Litigation Reform Act (PLRA), Pub.L. No. 104–134, 110 Stat. 1321, § 801–10, signed into law on 26 April 1996. The PLRA was designed to discourage frivolous lawsuits and to slow the tide of lawsuits filed in federal courts for grievances relating to prisoners' confinement. The federal statute used several mechanisms to

---

**7.** *See Gibbs v. Bureau of Prison Office,* 986 F.Supp. 941 (D.Md.1997); *Alexandroai v. California Dep't of Corrections,* 985 F.Supp. 968 (S.D.Cal. 1997); *Harris v. Gunderman,* 30 F.Supp.2d 664 (S.D.N.Y.1999); and *Perez v. Wisconsin Dep't of Corrections,* 182 F.3d 532 (7th Cir.1999).

achieve these goals, namely to require the payment of a filing fee, to limit the types of actions that may be filed, to limit attorney's fees, to empower judges to determine and dismiss frivolous suits, and to require the exhaustion of administrative remedies before a prisoner may seek independent judicial intervention by way of a civil action. Respondent reasons that since the PLA was formulated after the PLRA and that the federal courts have determined that the delivery of medical services in correctional institutions is a "condition of confinement", Petitioner's lawsuit relates to a "condition of confinement" and thus is subject to the administrative procedures of the DOC, and perhaps the IGO, through the exhaustion requirement of the PLA.

Secondly, Respondent asserts that Petitioner is mistaken in his assertion that there is no administrative remedy available to his malpractice claim because the DOC routinely handles prisoner grievances relating to prison medical services. It argues the Administrative Remedy Procedure delineated by the DOC in its written Directives implicitly allows for medical malpractice complaints against private contractors. It points to DOC Directive 185–002, Section IV(C), which states in pertinent part:

Inmates may seek relief through the Administrative Remedy Procedure for issues which include but are not limited to:

1. institutional policies and procedures;

2. *medical services;*

3. access to courts;

4. religious liberties;

5. lost, damaged, stolen, destroyed, or improperly confiscated property;

6. use of force;

7. institutional conditions affecting health, safety, and welfare; and

8. administration and operation of the Administrative Remedy Procedure.

(Emphasis added). Respondent sees the term "medical services" as all encompassing. It asserts that the medical services referenced in Section IV.C.2. includes malpractice allegations against private contractors. None of Respondent's arguments convinces us that the PLA exhaustion requirement applies to Petitioner's complaint in the case *sub judice.*

## A.

■ This is a case of first impression in Maryland.[8] The central issue here is whether the PLA administrative exhaustion requirement encompasses prisoner malpractice lawsuits filed against private contractors who provide medical services to prisoners under the control and responsibility of the DOC. We hold that it does not.

■ At the outset, we recognize that because they are "[e]stablished by legislative bodies, administrative agencies derive their power from enabling statutes that govern them." *Department of Econ. and Employment Dev. v. Lilley,* 106 Md.App. 744, 759, 666 A.2d 921, 928 (1995). An administrative agency is a "creature of statute, [which] has no inherent powers and its authority thus does not reach beyond the warrant provided it by statute." *Holy Cross Hosp. Of Silver Spring, Inc. v. Health Servs. Cost Review Comm'n,* 283 Md. 677, 683, 393 A.2d 181, 184 (1978). Generally, absent express legislative intent, the role of this Court is to determine whether an agency is empowered to decide the issue in controversy and whether the agency's procedures can be "performed within the confines of the traditional standards of procedural and substantive fair play." *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 223, 334 A.2d

---

8. We have held previously that an inmate attempting to sue a prison guard for common law tort damages allegedly inflicted in a jail cell battery must exhaust the IGO administrative remedy process before pursuing his tort remedy in court. *McCullough v. Wittner,* 314 Md. 602, 608, 552 A.2d 881, 884 (1989). The present case, however, involves an alleged tortfeasor who is not an employee or official of the Department or the DOC. Moreover, *McCullough* was decided before enactment of the PLA.

514, 523 (1975). When it is doubtful that the General Assembly has vested powers in an agency to decide certain issues, the agency's ability to exercise that power will be circumscribed by the courts. *See Jackson v. Wyoming,* 786 P.2d 874, 878 (Wy.1990); *Hills Dev. Co. v. Township of Bernards,* 229 N.J.Super. 318, 551 A.2d 547, 559 (A.D.1988). Our task, therefore, is to determine whether the legislature intended, when it enacted the PLA, that a prisoner asserting medical malpractice against a private contractor providing medical services for the State first be required to file his alleged grievance with the DOC and/or the IGO before filing a common law tort complaint in state court.[9]

The principles of statutory construction are not novel. "Every quest to discover and give effect to the objectives of the legislature begins with the text of the statute." *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088, 1091 (1999). If the legislature's intentions are evident from the text of the statute, our inquiry normally will cease and the plain meaning of the statute will govern. *See id. See also Martin v. Beverage Capital Corp.,* 353 Md. 388, 399, 726 A.2d 728, 733 (1999); *Philip Elec. North America v. Wright,* 348 Md. 209, 216–17, 703 A.2d 150, 153 (1997); *Schuman, Kane, Felts & Everngam v. Aluisi,* 341 Md. 115, 119, 668 A.2d 929, 931 (1995). We bear in mind, however, that the plain-meaning rule is elastic, rather than cast in stone. *See Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 513, 525 A.2d 628, 632 (1987). If persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it. *See Kaczorowski,* 309 Md. at 514, 525 A.2d 628. We often look to the legislative history, an agency's interpretation of the statute, and other

---

**9.** Petitioner's argument that he should not be required to exhaust the DOC or the IGO administrative processes because those procedures can not grant him the sole relief he seeks, monetary damages, is a nonstarter. We held, in *McCullough,* 314 Md. at 610, 552 A.2d at 885, that the Department and the IGO "have statutory authority to award monetary damages as long as funds are appropriated or otherwise properly available for this purpose [battery tort claim]." The subsequent adoption of the PLA has not attenuated the vitality of this holding.

sources for a more complete understanding of what the General Assembly intended when it enacted particular legislation. *See Harris v. State*, 331 Md. 137, 146, 626 A.2d 946, 950 (1993). In so doing, "[w]e may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore v. Department of Employment and Training*, 309 Md. 28, 40, 522 A.2d 382, 388 (1987). This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense. *See Huffman*, 356 Md. at 628, 741 A.2d at 1091; *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 445, 697 A.2d 455, 459 (1997); *Kaczorowski*, 309 Md. at 513, 525 A.2d at 632.

■ "We should first attempt to ascertain [the legislature's] intent from the statutory language, reading pertinent parts of the legislative language together, giving effect to all of those parts if we can, and rendering no part of the law surplusage." *Sinai Hosp. of Baltimore*, 309 Md. at 39–40, 522 A.2d at 388. Our statutory construction analysis, therefore, requires an extensive restatement and integration of various sections of the PLA under Maryland Code (1974, 1998 Repl. Vol., 1999 Supp.), Courts and Judicial Proceedings Article, §§ 5–1001, et seq., and Maryland Code (1999), Correctional Services Article (CSA), §§ 10–201, et seq. Only after the statutory mosaic is pieced together, and placed in its proper context, can we gather a true picture of the scope of the PLA's exhaustion requirement as it may apply to the case *sub judice*. PLA § 5–1001 provides the definitions at issue:

(a) *In general.*—In this subtitle the following words have the meanings indicated.

(b) *Administrative remedy.*—(1) "Administrative remedy" means any procedure for review of a prisoner's complaint or grievance, including judicial review, if available, that is provided by the Department, the Division of Correction, or any county or other municipality or political subdivision, and results in a written determination or disposition.

(2) "Administrative remedy" includes a proceeding under Title 10, Subtitle 2 of the State Government Article or Title 10, Subtitle 2 of the Correctional Services Article.

(c) *Civil action.*—(1) "Civil action" means a legal action seeking money damages, injunctive relief, declaratory relief, or any appeal filed in any court in the State that relates to or involves a prisoner's conditions of confinement.

(2) "Civil action" includes:

(i) An appeal of an administrative remedy to any court;

(ii) A petition for mandamus against the prisoner's custodian, its officers or employees, or any official or employee of the Department;

(iii) Any tort claim against a custodian, the custodian's officers or employees, or any employee or official of the Department;

(iv) Any action alleging a violation of civil rights against a custodian, the custodian's officers and employees, or any official or employee of the Department; or

(v) Any appeal, application for leave to appeal, or petition for certiorari.

(3) "Civil action" does not include a postconviction petition or petition for habeas corpus relief.

(d) *Conditions of confinement.* —"Conditions of confinement" means any circumstance, situation or event that involves a prisoner's custody, transportation, incarceration, or supervision.

(e) *Custodian.*—"Custodian" means the institution or agency that has custody of the prisoner.

(f) *Department.*—"Department" means the Department of Public Safety and Correctional Services.

(g) *Prisoner.*—(1) "Prisoner" means a person who is in the custody of the Department or a local detention center.

(2) "Prisoner" includes pretrial detainees.

The "administrative remedy" process referenced in PLA § 5–1001(b)(2) and, at issue here, is set forth under CSA, Title 10,

Subtitle 2.[10] CSA § 10–206 permits a prisoner to submit a complaint for grievances against employees of the DOC to the IGO. It states:

(a) *Authorized.*—Subject to subsection (b) of this section, if an individual confined in a correctional facility in the Division of Correction, otherwise in the custody of the Commissioner of Correction, or confined in the Patuxent Institution has *a grievance against an official or employee of the Division of Correction* or the Patuxent Institution, the individual may submit a complaint to the Office within the time and in the manner required by regulations adopted by the Office.

(b) *Exhaustion of remedies.*—If the Division of Correction or the Patuxent Institution has *a grievance procedure applicable to the particular grievance of an individual* described in subsection (a) of this section and the Office considers the procedure to be reasonable and fair, *the Office, by regulation, may require that the procedure be exhausted before submission of a complaint to the Office.*

(Emphasis added).

After a prisoner files a complaint, CSA § 10–207(a) then requires that "[t]he Executive Director or the Director's designee shall conduct a preliminary review of each complaint submitted to the Office." Following the preliminary review, the Executive Director or designee will either dismiss a complaint that lacks merit or refer a meritorious complaint to the Maryland Office of Administrative Hearings (an independent administrative adjudicatory agency). *See* CSA § 10–207(b) and (c).[11] If the complaint is meritorious, the administrative

---

10. Generally, Maryland Code (1984, 1999 Repl.Vol.), State Government Article, § 10–201, et seq., sets forth the procedures for administrative hearings, notice requirements, and judicial review of administrative decisions.

11. Section 10–207 states in pertinent part:

(b) *Dismissal.*—(1) After preliminary review, if the complaint is . determined to be wholly lacking in merit on its face, the Executive

review process continues under CSA §§ 10–208 and 10–209. CSA § 10–208(a) grants to the Office of Administrative Hearings the authority to "conduct hearings under this subtitle at correctional facilities in the Division of Correction or at the Patuxent Institution." The hearing process provides for access to documentary evidence, the power of subpoena, requirements of testimony under oath, and that the testimony be recorded. *See* § 10–208(b) and (c).[12] After a hearing on the complaint, the Office of Administrative Hearings issues "a decision in the form of an order." § 10–209(a)(1). "The order shall include a statement of the findings of fact, the conclusions of law, and the disposition of the complaint under subsection (b) of this section." § 10–209(a)(2). The Office of Administrative Hearings may either dismiss the complaint as

---

Director or the Director's designee may dismiss the complaint without a hearing or specific findings of fact.

(2)(i) The order of dismissal shall be forwarded to the complainant within 60 days after the complaint was submitted to the Office.

(ii) The order of dismissal constitutes the final decision of the Secretary for purposes of judicial review.

(c) *Referral to Office of Administrative Hearings.*—(1) After preliminary review, if the complaint is not found to be wholly lacking in merit on its face, the Office shall refer the complaint to the Office of Administrative Hearings.

(2) The Office of Administrative Hearings shall hold a hearing on the complaint as promptly as practicable.

12. Section 10–208 states in pertinent part:

(b) *Access to documentary evidence.* —With the approval of the Secretary, the Office of Administrative Hearings shall have access to documentary evidence of any person or facility that is the subject of an investigation or proceeding under this subtitle:

(1) at all reasonable times; and

(2) for the purpose of examining and copying the evidence.

(c) *Subpoenas; oaths; record of testimony.*—(1) The Office of Administrative Hearings may issue subpoenas requiring:

(i) the attendance and testimony of witnesses; and

(ii) the production of documentary evidence relating to any matter under investigation.

(2) The administrative law judge presiding at a hearing may administer oaths.

(3) A record of the testimony presented at the hearing shall be kept in accordance with regulations adopted by the Office of Administrative Hearings.

lacking in merit, or, if the complaint has merit, forward a proposed order to the Secretary for review. *See* § 10–209(b)(1)(i) and (2). If the complaint is dismissed by the Office of Administrative Hearings "[t]he order of dismissal constitutes the final decision of the Secretary for purposes of judicial review." § 10–209(b)(1)(ii). If, however, the complaint is meritorious, the Secretary reviews the order and affirms, remands, or modifies it. *See* § 10–209(c).[13] "Unless the complaint is remanded, the Secretary's order constitutes the final decision for purposes of judicial review." § 10–209(c)(3)(ii).

The final step of the statutorily-contemplated process is judicial review. The procedure for judicial review is set forth in CSA § 10–210:

§ 10–210. Judicial review

(a) *Exhaustion of remedies.*—A court may not consider an individual's grievance that is within the jurisdiction of the Office or the Office of Administrative Hearings unless the individual has exhausted the remedies provided in this subtitle.

(b) *Circuit court review.*—(1) The complainant is entitled to judicial review of the final decision of the Secretary under § 10–207(b)(2)(ii) or § 10–209(b)(1)(ii) or (c)(3)(ii) of this subtitle.

(2) Proceedings for review shall be instituted in the circuit court of the county in which the complainant is confined.

---

13. Section 10–209(c) states in pertinent part:

(c) *Review by Secretary.*—(1) Within 15 days after receiving a proposed order under subsection (b)(2) of this section, the Secretary shall issue an order affirming, reversing, or modifying the order of the Office of Administrative Hearings, or remanding the complaint to the Office of Administrative Hearings for further proceedings.

(2) The Secretary may take any action the Secretary considers appropriate in light of the findings of the Office of Administrative Hearings, including ordering the appropriate official to accept as a whole or in part the recommendation of the Office of Administrative Hearings.

(3) Review by the court shall be limited to:

(i) a review of the record of the proceedings before the Office and the Office of Administrative Hearings and any order issued by the Secretary following those proceedings; and

(ii) a determination of whether the complainant's rights under federal or State law were violated.

(c) *Appellate review.*—(1) The Administrative Procedure Act does not apply to appellate review of a final judgment of the circuit court under this section.

(2) A party aggrieved by the decision of the circuit court may file an application for leave to appeal to the Court of Special Appeals in accordance with the Maryland Rules.

It is clear that the CSA establishes for covered inmate grievances an administrative remedy through the IGO that is primary, but not exclusive, and which must be invoked and exhausted before an inmate ordinarily may seek review of an adverse decision. *See Zappone v. Liberty Life Ins. Co.,* 349 Md. 45, 60, 706 A.2d 1060, 1067–68 (1998).

The legislature also injected several judicial screening procedures into the PLA to ensure strict compliance with its administrative exhaustion requirement, including documentary proof of exhaustion and judicial scrutiny of the initial complaint in any civil action filed with a court by an inmate. PLA § 5–1003 states, in pertinent part:

(a) *In general.*—(1) A prisoner may not maintain a civil action until the prisoner has fully exhausted all administrative remedies for resolving the complaint or grievance.

(2) Except as provided in paragraph (3) of this subsection, an administrative remedy is exhausted when the prisoner has pursued to completion all appropriate proceedings for appeal of the administrative disposition, including any available proceedings for judicial review.

*(3) Judicial review following administrative consideration shall be the exclusive judicial remedy for any grievance or complaint within the scope of the administrative process, unless the prisoner's complaint or grievance was*

*found to be meritorious and monetary damages were not available through the administrative remedy available to the prisoner.*

(b) *Proof.*—(1) When a prisoner files a civil action, the prisoner shall attach to the initial complaint proof that administrative remedies have been exhausted.

(2) The attachment shall include proof:

(i) That the prisoner has filed a complaint or grievance with the appropriate agency;

(ii) Of the administrative disposition of the complaint or grievance; and

(iii) That the prisoner has appealed the administrative disposition to the appropriate authority, including proof of judicial review, if available.

(3) On receipt of a prisoner's initial complaint that does not have attached to it proof that the prisoner has fully exhausted the administrative remedies available, the court shall dismiss the case without prejudice and grant the prisoner reasonable leave to amend the complaint and to provide the proof necessary to demonstrate that the prisoner has fully exhausted the administrative remedies.

(c) *Dismissal.*—A court shall dismiss a civil action if the prisoner filing the action has not completely exhausted the administrative remedies.

(Emphasis added).

When a civil action is filed with a court, PLA § 5–1004 mandates that the court conduct a review of the initial complaint. It states:

(a) *Review of complaint.* —prior to service of process of the prisoner's civil action, the court shall review the prisoner's initial complaint and identify any cognizable claims.

(b) *Grounds for dismissal.*—After reviewing the prisoner's complaint, the court may dismiss the civil action, or any portion thereof, with or without prejudice, if it finds that the civil action:

(1) is frivolous, malicious, or fails to state a claim for which relief can be granted;

(2) Seeks monetary damages from a defendant who is immune from such relief; or

(3) is barred under § 5–1003(a) of this subtitle.

(c) *Proof of exhaustion of remedies.* —An order of dismissal under subsection (b)(1) or (2) of this section may be issued without first requiring proof of exhaustion.

PLA § 5–1005 further provides the court with the power to dispose of frivolous actions and impose restrictions on prisoners that file them.[14] In addition to exhausting all administrative remedies, the PLA requires prisoners to pay for court costs.[15] Aligned with this requirement is a provision for judicial discretion to waive or reduce the court costs imposed

---

**14.** § 5–1005. Frivolous actions.

(a) *Final order or judgment.* —A court may include in its final order or judgment in any civil action a finding that the action was frivolous.

(b) *Docket entries.*—A finding under subsection (a) of this section shall be reflected in the docket entries of the case.

(c) *Effect of filing actions declared frivolous.*—(1) A prisoner who has filed three or more civil actions that have been declared to be frivolous by a court of this State or a federal court for a case originating in this State may not file any further civil actions without leave of court.

(2) If a prisoner has filed three or more civil actions that have been declared to be frivolous by a court of this State or a federal court for a case originating in this State, a court may place the prisoner's remaining and future civil actions on an inactive case list and permit the prisoner to pursue only one civil action at a time, regardless of jurisdiction.

**15.** § 5–1002. Filing fees.

(a) *In general.*—(1)(i) Except as provided in subsection (c) of this section, a prisoner who maintains a civil action shall pay all or a portion of the applicable filing fee, as determined by the court.

(ii) unless a waiver is granted under subsection (c) of this section, a fee determined by the court under subparagraph (i) of this paragraph shall be at least 25 percent of the entire filing fee otherwise required for a civil action.

(2) The court may:

(i) Authorize any fee to be paid over a specific period of time; and

(ii) Establish a payment schedule.

(3) Until any applicable filing fee is paid, service of the complaint shall be withheld, discovery may not commence, and other proceedings may not be convened.

should the court consider the prisoner's grievance merits such a reduction or waiver. The PLA reinforces the CSA's regulatory scheme for the IGO as the primary, but not exclusive, administrative remedy for covered inmate grievances or complaints and the need for invocation and exhaustion of that process. Of additional note, however, PLA § 5–1003(a)(3) directs limited exclusivity for the judicial review of an unfavorable disposition of an aggrieved inmate's covered grievance or complaint. Thus, an inmate, having exhausted the administrative remedy, generally may invoke the jurisdiction of the courts in aid of his or her cause solely through the judicial review authorized by CSA § 10–210(b) and (c), unless the administrative process resulted in a determination of merit in the complaint or grievance and monetary damages were not available through the administrative process.[16]

---

(b) *Amount.*—In establishing the amount of the filing fee to be paid under subsection (a) of this section, the court shall consider, based on information in the complaint and provided by the prisoner:

(1) The seriousness of the claim;

(2) The likelihood of success;

(3) The urgency of consideration;

(4) The amount of funds available in any institutional account and any account outside of the institution;

(5) The employment status of the prisoner in the institution and income from the employment;

(6) Any financial obligations of the prisoner; and

(7) The length of time that is likely to pass before the filing fee that is imposed is able to be paid.

(c) *Waiver.*—A court may waive payment of the entire required filing fee for a civil action filed by a prisoner only on a written showing under oath by the prisoner that:

(1) The prisoner is indigent;

(2) The issue presented is of serious concern;

(3) Delay in the consideration of the issues presented will prejudice the consideration of the claim;

(4) The prisoner is not likely to accumulate sufficient funds to pay the required filing fee within a reasonable period of time; and

(5) The prisoner possesses a reasonable likelihood of success on the merits of the claim.

(d) *Reimbursement as costs.*—If a prisoner prevails in an action, the filing fee that is paid by the prisoner shall be reimbursed to the prisoner by the defendant through costs awarded by the court.

**16.** As noted *supra* at n. 9, the availability of monetary relief via the IGO grievance/ complaint process, and the circumstances controlling that

B.

■ In addition to the procedures fashioned by integration of the PLA and CSA, the legislative history of the PLA further illustrates the regulatory scheme intended by the General Assembly. In enacting the PLA, the legislature essentially was reacting to federal legislation that similarly sought to inhibit the ability of prisoners to file lawsuits in the federal court system without first attempting to resolve their grievances through available administrative procedures. In 1996, Congress enacted the Prison Litigation Reform Act (PLRA), Pub.L. 104–134, Act of April 26, 1996. Congress recognized that:

> Prisoners file civil rights actions primarily to challenge their conditions of confinement in prisons or jails. Federal district courts have jurisdiction over cases by state prisoners under the 1871 Civil Rights Act, 42 U.S.C. § 1983. Section 1983 is now interpreted as creating a private cause of action against any person who, under color of state law, deprives another citizen or person within the jurisdiction of the United States of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States . . .

> Alleged violations of prisoners' civil rights most commonly involve the "cruel and unusual punishments" clause of the Eighth Amendment, the free exercise of religion clause of the First Amendment, and the due process clause of the Fourteenth Amendment.

---

relief, have been determined. Thus, the exclusivity provision of PLA § 5–1003(a)(3) would not affect Petitioner's complaint, if covered by the CSA and PLA at all.

We need not decide in this case whether the limited exclusivity accorded the judicial review component of the statutory scheme by PLA § 5–1003(a)(3) would operate in Petitioner's case to abrogate his right to bring a common law negligence action. *See Holiday Point Marina v. Anne Arundel County*, 349 Md. 190, 203, 707 A.2d 829, 835 (1998). This is so because, as we shall explain *infra*, Petitioner's complaint is not within the contemplated subject matter jurisdiction of the administrative remedy process that is at the heart of this case.

Dorothy Schrader, *Prison Litigation Reform Act: Survey of Post–Reform Act Prisoners' Civil Rights Cases*, Congressional Research Service Report for Congress, 4 Nov. 1997, at 2 ("CRS PLRA Survey"). These civil rights claims were seen by Congress as being largely frivolous. The PLRA was enacted to stop the flood of prisoner cases by curtailing "the authority of the federal courts to remedy prison conditions, including prison overcrowding, that allegedly violate prisoners' federal rights." CRS PLRA Survey, at 1. Until its inception, "[t]he pre-PLRA section 1997e(a) granted district courts discretion whether to require a prisoner to exhaust his administrative remedies." *Alexander v. Hawk,* 159 F.3d 1321, 1323 (11th Cir.1998). Under the PLRA, Congress created a steeplechase obstacle in the path of prisoner actions seeking a forum in federal court. Getting over that wall is difficult:

> The [PLRA] generally requires payment of filing fees and exhaustion of administrative remedies; curtails the authority of federal courts to order prospective relief, including early releases of prisoners to remedy prison overcrowding; bars federal court-ordered prison construction and orders to raise taxes as remedies; places limits on repeat frivolous filers; and requires that prisoners who win monetary damage awards must use the money to pay their outstanding restitution orders to compensate crime victims.

CRS PLRA Survey, at 3. 42 U.S.C. § 1997e(a) in particular requires the exhaustion of all available administrative remedies.[17] It states:

---

**17.** Interestingly, since enactment of the PLRA, the federal courts of appeals are split over whether its exhaustion requirement requires a plaintiff to file a grievance with the administrative agency when the administrative agency cannot provide any substantial remedy to the plaintiff.

The Fifth, Ninth, and Tenth Circuits have held that if no adequate remedy is available to a prisoner that prisoner may seek remedy in the courts and forego the administrative remedy process. In *Garrett v. Hawk,* 127 F.3d 1263, 1267 (10th Cir.1997), the Court of Appeals noted that "Congress clearly intended to require prisoners to exhaust only 'such administrative remedies as are available' before bringing a [federal action] in federal court." It reasoned further that " a prisoner

(a) Applicability of administrative remedies. No action shall be brought with respect to prison conditions under section 1979 of Revised Statutes of the United States (42 U.S.C.1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

In Maryland, the General Assembly's response to the Congressional enactment of the PLRA was swift. In a memorandum dated 5 March 1997, the Department of Public Safety and Correctional Services commented in favor of H.B. 926, the bill which eventually became the PLA:

This bill parallels Congressional action last year to remove frivolous prisoner litigation from the federal courts. Absent similar state legislation, it is likely this new federal law will not yield a reduction in frivolous litigation filed by inmates, but will *shift their interest in filing to state courts.* Consequently, the Department will not enjoy any of the benefits of a reduction in federal lawsuits brought by inmates. The correctional institutions will still be required to transport the inmate to court, and correctional officers and other staff will be absent from duty in order to appear as witnesses in court.

\* \* \* \* \* \*

[however] can only exhaust administrative remedies that are actually available." *Id.* The Court went on to hold that in the case before it, Congress still had not provided an effective administrative remedy and until it did so "no exhaustion of administrative remedies is required under PLRA ... because no such remedies exist to be exhausted." *Id.* *Accord Whitley v. Hunt,* 158 F.3d 882, 886–87 (5 th Cir.1998); *Lunsford v. C.D. Jumao–As,* 155 F.3d 1178, 1179 (9 th Cir.1998). *But see Arvie v. Stalder,* 53 F.3d 702, 706 (5 th Cir.1995)(holding that prisoner seeking both monetary damages and injunctive relief must exhaust administrative remedy procedures if agency can grant injunctive relief).

The Sixth, Seventh, and Eleventh Circuit Courts of Appeal have held to the contrary. These Courts have held that no futility exception applies to the PLRA despite the unavailability of remedies. *See Lavista v. Beeler,* 195 F.3d 254, 257 (6 th Cir.1999); *Perez v. Wisconsin Dep't of Corrections,* 182 F.3d 532, 537 (7 th Cir.1999); *Alexander v. Hawk,* 159 F.3d 1321, 1326 (11 th Cir.1998).

HB 926 is intended to discourage inmates from filing frivolous lawsuits. The Department is confident the courts will continue to hear and decide any legitimate lawsuits brought by inmates individually or as a group. Accordingly, the Department respectfully requests that the Committee give favorable consideration to HB 926.

(Emphasis added).

 It appears, therefore, that the General Assembly was fearful that because prisoner claims would be more limited in the federal courts with jurisdiction over Maryland inmates' claims, Maryland inmates would turn to Maryland state courts to file their multitudinous claims. Like its federal predecessor, the PLA's purpose is to discourage frivolous claims from burdening state government by inhibiting cases against the DOC and its officials and employees from entering the court system, thereby also saving judicial resources, and relieving the Attorney General from its obligation to defend those claims. This is accomplished in part by requiring that the available administrative procedures be exhausted, the prisoner ordinarily pay a filing fee, and the award of punitive damages being capped at $2000 and, if awarded, the amount would be paid to satisfy claims by a prisoner's victim or to pay the prisoner's outstanding child support obligations.

The legislature's intent to reduce only governmental expenses regarding prisoner claims is echoed by the fiscal note authored by the Department of Fiscal Services for the Maryland General Assembly, and dated 5 May 1997 (revised). The fiscal analysis purported to address HB 926's effect on state, local, and small businesses. The analysis summarized that the bill does not affect small business. All effects analyzed by the Department of Fiscal Services referenced savings for state and local governments. It projected the effect on the State as follows:

State Effect: The bill is intended to reduce the number of civil suits filed by inmates relating to conditions of confinement, especially the number of frivolous suits. The magnitude and form of the bill's impact on State finances and

operations is substantially dependent on its ability to deter or slow the pace at which such civil actions are filed by inmates. That potential deterrence cannot be reliably estimated at this time.

There are approximately 480 inmate civil action cases defended by the Attorney General annually. These are cases where the State and/or its employees are being sued by inmates. In addition, there are also large numbers of inmate filings annually in the form of petitions to change names which, regardless of the change sought, are not now treated as frivolous by the judiciary. New federal legislation aimed at reducing inmate filings in federal courts may have the effect of driving the number of State filings significantly higher. The workload of the Office of the Attorney General could be significantly affected by this bill, but only to the extent that staff time now spent in court or otherwise defending the State and/or its employees would be reallocated.

General fund revenues could increase to the extent that the bill's provisions for the payment of filing fees and court costs is successful in securing actual payments from inmates, for those cases heard in the District Court or the courts of appeal. The magnitude of such an increase cannot be reliably estimated at this time. Any reduction in hearings for the courts resulting from this bill would reduce court dockets and, thereby, reduce the workload of the courts by an indeterminate amount.

The effects on the local government were similarly discussed. *See* Fiscal Note, 3.

## C.

 In addition to the statutory language and legislative history, we are influenced to some degree by the IGO's own interpretation of its role in conjunction with the PLA and the administrative procedures for addressing inmate complaints that were in place before enactment of the PLA. While it is true that an agency's view of the law does not bind this Court's interpretation of the statutory scheme, we have

noted before that an agency's expertise in its field is particularly persuasive. *See Sinai Hosp. of Baltimore,* 309 Md. at 46, 522 A.2d at 391. Indeed, courts give significant weight to the agency's interpretation of the statute that it is required to administer. *See Zappone,* 349 Md. at 64, 706 A.2d at 1070. We note as well that "[i]n the matter of statutory construction it is well understood that the view taken of a statute by administrative officials soon after its passage is strong, persuasive influence in determining the judicial construction and should not be disregarded except for the strongest and most urgent reasons." *Holy Cross Hosp. of Silver Spring, Inc.,* 283 Md. at 685, 393 A.2d at 185. As one commentator has aptly explained:

> The powerful effect courts give most agency interpretations of the agency's own regulations is based on common sense. The agency typically is in a superior position to determine what it intended when it issued a rule, how and when it intended the rule to apply, and the interpretation of the rule that makes the most sense given the agency's purposes in issuing the rule. Courts have significant institutional disadvantages in attempting to resolve these critical issues. However, courts do not simply rubber stamp agency interpretations of rules.

3 Kenneth C. Davis and Richard J. Pierce, Jr., Administrative Law Treatise, § 6.10, at 282 (3d 1994).

Documentation was presented in this case that the IGO declines to hear prisoner grievances against private contractors. In a letter dated 16 July 1992, prior to the PLA's enactment, the Executive Director of the IGO stated in pertinent part:

> this office has jurisdiction over complaints filed by State prisoners against employees or officials of the Division of Correction or Patuxent Institution. Our jurisdiction does not extend to complaints against the private health care contractor or its employees.

The conclusion reached in the aforementioned letter is consistent with a letter dated 20 November 1998 from the

Executive Director of the IGO to an inmate at the DOC's Jessup facility which states in pertinent part in response to a letter from the inmate:

> please be advised that the jurisdiction of this agency is limited to complaints filed against officials or employees of the Division of Correction and Patuxent Institution. We do not have jurisdiction over any complaint you may have against a private health-care contractor or its employees who provide medical care and services to prisoners.

To the extent that the DOC's directives establishing an ARP process may be considered as a part of the scheme of administrative remedies within the contemplation of the PLA (a subject on which we need not opine in this case—*see infra,* n. 18), the Attorney General's Office, speaking on behalf of its client, the DOC, is apparently of the opinion that the DOC administrative procedures also do not address prisoner claims against private contractors. In a letter from the Attorney General's Office, dated 27 January 1999, to a District Court judge it states:

> while Section IV C.2. of the directive [DOC Directive 185–002] appears to require ARP exhaustion for inmate claims against medical contractors and their employees, the Division does not interpret the language in that section of the directive so broadly. Rather, that language is intended to refer only to inmate claims that relate to the delivery of medical services by correctional staff, and not by any other persons or entities over which the Division has no jurisdiction, like the medical contractors. Therefore, for instance, an inmate who claims that his tier correctional officer improperly refused to allow him to go to the institutional hospital must, pursuant to the directive, avail himself to the ARP process, but an inmate alleging negligence by a doctor employed by a medical contractor may not do the same.

The position of the Attorney General's Office is consistent with the DOC Directives relating to the Administrative Remedy Procedure, as well as to the CSA and PLA requirements. The DOC Directives present in the record of this case are

aimed at resolving prisoner grievances against the DOC, its officers, and its employees. There is no mention whatsoever of private contractors or the procedures to be observed should a claim of medical malpractice be submitted by prisoners against such a contractor.[18]

### D.

We hold that a plain reading of the PLA and CSA, meshed with the legislative history and the IGO's interpretation of its role in prisoner claims against private contractors,

---

**18.** Respondent also placed in the record before the Circuit Court photocopies of indices of inmates' ARP "complaints" and correspondence logs from various DOC facilities for the periods November— December 1997 (in the case of the complaints) and April 1999 (as to the correspondence). A short summary of the subject of each recorded complaint or piece of correspondence was included. Some of the summaries indicate subject matter such as "inadequate medical treatment" and "eye surgery." Additionally, Respondent submitted copies of various completed ARP forms and the dispositions accorded them by either wardens or the DOC Commissioner (or their designees) from 1996 and 1999. Although difficult to read and fully understand, the inmates' complaints seem in many instances to touch on medical issues. Respondent contended that these documents demonstrated an ongoing acceptance and consideration by the DOC, under its ARP directives, of complaints against private medical contractors at the respective DOC facilities represented on those forms. A close reading of these documents does not support necessarily Respondent's thesis. At best, the documentation is inconclusive because it lacks much factual detail as to the matters actually placed before the DOC in the examples offered. Without more facts, they contribute little persuasive force to Respondent's argument because we can not analogize fairly the DOC dispositions to the factual allegations of Petitioner's complaint.

Even if the DOC maintained an internal practice of entertaining, via the ARP procedure, inmate complaints regarding matters implicating the performance by a private medical services contractor of its contractual medical duties, it is too great a leap to suggest that the DOC has entertained, or would entertain, a medical malpractice claim as asserted by Petitioner. There may be many managerial and administrative reasons for the DOC to use the ARP process as one way to monitor the performance of the medical contractors, short of volunteering it as a form of alternative dispute resolution for malpractice claims. We shall leave for another day, as it has not been briefed or argued here, whether, in any event, the DOC directives are entitled to the force and effect of law. If not, their interpretation and implementation may have no bearing on the CSA administrative process and, thus, may not be cognizable in an analysis of the PLA's exhaustion requirement.

overwhelmingly demonstrate that the PLA administrative remedy exhaustion requirement does not apply to lawsuits filed by inmates against private contractors alleging a claim of medical malpractice. We cannot require the exhaustion of an administrative remedy process that is inapplicable to a prisoner's alleged grievance.

■ The PLA and CSA are devoid of any reference to private contractors or businesses. Nothing in the statutes would lend the slightest hint that the legislature intended the statute's exhaustion requirement be as all encompassing as Respondent alleges. PLA § 5–1001(c)'s definition of a "civil action" references solely actions against state employees for petitions of mandamus, tort claims, and civil rights violations. Civil actions as they relate to tort claims in particular are defined as "[a]ny tort claim against a custodian, the custodian's officers or employees, or any employee or official of the Department [of Public Safety and Correctional Services]." Furthermore, the IGO is specifically confined to address and investigate complaints "against an official or employee of the Division of Correction." CSA § 10–206. Respondent is not, nor does it claim to be, an official or employee of the DOC, or a custodian of Petitioner. Respondent likewise does not argue that it is a state actor for any purpose.

■■ We add that there is no mention in the PLA's legislative history of curtailing prisoner malpractice lawsuits against private contractors or private entities. The statute was designed to prevent or inhibit the influx of prisoner claims against State officials and employees in Maryland's state courts and to lessen the burden on the Attorney General in defending such prisoner claims. It was not intended apparently to shield private medical contractors from malpractice claims by prisoners or as an aid in the pre-litigation discovery or non-judicial resolution of such claims. While it is true that the Maryland courts have recognized that the absence of express statutory language granting authority to an administrative agency is not dispositive of whether that agency has such authority, its absence from the statute is nonetheless a factor which may be considered. *See Lussier v. Maryland*

*Racing Comm'n,* 100 Md.App. 190, 203–04, 640 A.2d 259, 266 (1994), *aff'd,* 343 Md. 681, 684 A.2d 804 (1996). *See also McCarthy v. Madigan,* 503 U.S. 140, 154, 112 S.Ct. 1081, 1091, 117 L.Ed.2d 291, 305 (1992) ("the absence of any monetary remedy in the grievance procedure also weighs heavily against imposing an exhaustion requirement").

None of the federal cases cited by Respondent support the proposition that medical malpractice is a condition of confinement as referenced in the PLA, let alone the PLRA. In *Wilson,* the conditions of confinement that were discussed related to a violation of a prisoner's federal rights. *See* 501 U.S. at 304–05, 111 S.Ct. at 2327, 115 L.Ed.2d at 282–83. Indeed, all of the federal cases cited by Respondent were decided in the context of a 42 U.S.C. § 1983 action where the prisoner "must allege the violation of right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 47, 108 S.Ct. 2250 2255, 101 L.Ed.2d 40, 48–49 (1988). Medical malpractice claims ordinarily do not rise to the level of violating a prisoner's federal civil rights and Petitioner does not claim that his grievance against Respondent amounts to a violation of his civil rights. In *Estelle v. Gamble,* Justice Marshall, writing for the majority, held:

> [A] complaint that a physician has been negligent in diagnosing or treating a [prisoner's] medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251, 261 (1976). A claim of malpractice is usually a state tort law claim and not an abridgement of a fundamental right under federal constitutional mores. *See Estelle,* 429 U.S. at 107, 97 S.Ct. at 293, 50

L.Ed.2d at 262. *See also Harris v. Hegmann,* 198 F.3d 153, 159 (5 th Cir.1999)(malpractice does not rise to a constitutional tort); *Sosebee v. Murphy,* 797 F.2d 179, 181 (4 th Cir.1986)(negligence is a tort law claim not arising to constitutional principles); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1080 (3d Cir.1976)(malpractice is state law claim, not constitutional abridgement).

The purposes for requiring the exhaustion of administrative remedies would hardly be achieved by accepting Respondent's interpretation of the PLA as it seeks to apply it here. First, the administrative agency's expertise is not circumvented by allowing for judicial determination of Petitioner's claim because the DOC and the IGO apparently claim no expertise in resolving or adjudicating medical malpractice claims against private medical service providers. The record shows the IGO will not entertain a grievance such as alleged by Petitioner because it believes it has no jurisdiction to do so. At oral argument before this Court, Respondent admitted that the IGO and the Office of Administrative Hearings will not hear Petitioner's claim. Moreover, unlike the battery of an inmate in his cell by a prison guard as alleged in *McCullough,* the allegations of Petitioner's complaint are not "obviously a matter falling within the expertise of the [IGO]." 314 Md. at 610, 552 A.2d at 885.

We are unconvinced that judicial resources will be saved by interpreting the PLA to require Petitioner to file his grievance with the DOC or the IGO before filing suit in state court. Respondent claims that the DOC will at least investigate Petitioner's grievance, yet the record does not support necessarily such a conclusion. Assuming *arguendo* that the DOC would investigate, Respondent admits that no entity in its conception of the administrative remedy process would issue findings of fact or conclusions of law in a form that would provide a basis for judicial review after the agency acts on Petitioner's case. The DOC ARP documentation submitted by Respondent to prove that the DOC receives and acts on inmate complaints against private medical contractors further illuminates the shortcomings of this contention. Without

proper administrative findings of fact there can be no judicial review. Judicial review procedures prohibit the courts from being fact-finders in such matters. *See Baltimore Lutheran High School Ass'n, Inc. v. Employment Sec. Admin.*, 302 Md. 649, 660–63, 490 A.2d 701, 707–08 (1985). A court's role is to review the facts as found by the expert eye of the administrative agency and to reverse those findings only if they are clearly erroneous. Respondent has not demonstrated that the DOC process would yield judicially reviewable administrative decisions.

We conclude that the General Assembly, while it was free to do so, did not craft the PLA or the CSA in a manner that envisioned the relevant administrative remedy as encompassing prisoner malpractice complaints against private medical service providers under contract with the State. We decline Respondent's invitation to read such an intention into the statutory or regulatory schemes.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS THAT IT REVERSE THE JUDGMENT OF THE DISTRICT COURT OF MARYLAND AND REMAND THIS MATTER TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY RESPONDENT.