914 A.2d 160

OHIO CASUALTY INSURANCE COMPANY

v.

Sara CHAMBERLIN, et al.

No. 1574, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Jan. 2, 2007.

Nancy L. Harrison (Gerald F. Strachan, on brief), Baltimore, for appellant.

Howard J. Needle, Baltimore, Jeffery R. Moffet, Owings Mills, for appellee.

Panel MURPHY, C.J., SALMON, KARWACKI, ROBERT L. (Ret., specially assigned), JJ.

Opinion by KARWACKI, J.

On May 23, 2005, Ohio Casualty Insurance Company, appellant, filed a motion in the Circuit Court for Baltimore County, seeking to compel Sara Chamberlin, appellee, to return $20,000 paid to her pursuant to Md.Code (2002 Repl.Vol.) § 19–511 of the Insurance Article ("Ins."). On August 12, 2005, the circuit court issued a written opinion and order denying appellant's motion, and this appeal followed.

The sole question presented for our consideration is whether the circuit court erred in denying appellant's request for reimbursement of the funds advanced pursuant to Ins. § 19–511. Finding no error, we shall affirm.

## FACTUAL BACKGROUND

This case arises out of an automobile accident involving motor vehicles operated by Sara Chamberlin, appellee, and Charlotte Deitrick. Chamberlin filed a complaint in the Circuit Court for Baltimore County against Deitrick and her own uninsured/underinsured motorist ("UIM") carrier, Ohio Casualty Insurance Company, appellant herein, claiming that she was injured as a result of Deitrick's negligence and demanding compensation from Deitrick and Ohio Casualty.

Prior to trial, Deitrick's insurer, *Progressive Insurance Company*, offered its policy limits of $20,000 in exchange for a release of all claims by both Chamberlin and Ohio Casualty. Ohio Casualty rejected the request for a release. Pursuant to Ins. § 19–511, Ohio Casualty advanced to Chamberlin the $20,000 that had been offered by Progressive, and the case proceeded to trial.

The jury returned a verdict in favor of Chamberlin in the amount of $5,445 and Progressive paid that amount to Ohio Casualty. By letter dated April 21, 2005, Ohio Casualty demanded that Chamberlin repay the $20,000 that had been advanced to her pursuant to § 19–511, but Chamberlin refused. Thereafter, Ohio Casualty filed a motion in the trial court seeking an order compelling the return of the $20,000.

A hearing was held on July 6, 2005, and the court held its decision *sub curia*. In a written opinion and order filed on August 12, 2005, the circuit court denied Ohio Casualty's request for an order compelling the return of the $20,000 paid to Chamberlin stating, in part:

> Ohio Casualty had an opportunity to carefully assess its exposure in this case, and it ultimately determined that [Chamberlin's] claim was worth significantly more than the proposed settlement amount; otherwise, it would have no reason to "thwart" settlement to preserve its own subrogation rights. Accordingly, [Chamberlin] is entitled to keep the $20,000 advanced by Ohio Casualty.

## DISCUSSION

Ohio Casualty contends that the circuit court erred in denying its motion to compel the return of the $20,000 paid to Chamberlin, to the extent that the funds advanced exceeded the jury verdict, because there is no provision in Maryland law or in the insurance policy issued to Chamberlin that entitles her to retain the full amount paid by Ohio Casualty, and it would be neither fair nor equitable to allow her to do so, particularly when the jury verdict was considerably less than

the amount advanced. Resolution of this issue requires us to examine § 19–511 of the Insurance Article.

As the Court of Appeals stated in *Adamson v. Correctional Medical Services, Inc.,* 359 Md. 238, 251, 753 A.2d 501 (2000), "[t]he principles of statutory construction are not novel." The cardinal rule of statutory construction is to ascertain and effectuate legislative intention. *State v. Green,* 367 Md. 61, 81, 785 A.2d 1275 (2001). Our "quest to discover and give effect to the objectives of the legislature begins with the text of the statute." *Adamson,* 359 Md. at 251, 753 A.2d 501 (quoting *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088, 1091 (1999)). " '[I]f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end.' " *Thomas v. Dep't of Labor, Licensing, and Regulation,* 170 Md.App. 650, 908 A.2d 99, 104 (2006)(quoting *Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001)). *See also Adamson,* 359 Md. at 251, 753 A.2d 501 (and cases cited therein)(if the Legislature's intentions are evident from text of statute, inquiry will cease and plain meaning of statute will govern).

" 'Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to reflect an intent not evidenced in that language.' " *Chesapeake & Potomac Telephone Co. v. Director of Finance for Mayor and City Council of Baltimore,* 343 Md. 567, 579, 683 A.2d 512 (1996)(quoting *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993)). Our goal in interpreting statutes is to give them their "most reasonable interpretation, in accord with logic and common sense, and to avoid a construction not otherwise evident by the words actually used." *Greco v. State,* 347 Md. 423, 429, 701 A.2d 419 (1997). We will avoid constructions that are illogical, unreasonable, or inconsistent with common sense. *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994). Moreover, we will not engage in a "forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Nesbit v. GEICO,* 382 Md. 65, 76, 854 A.2d 879 (2004).

"We bear in mind, however, that the plain meaning rule is elastic, rather than cast in stone." *Adamson,* 359 Md. at 251, 753 A.2d 501 (citing *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987)). "If persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it." *Id.* We may consider the context in which the statute appears, related statutes, legislative history, and other sources for a more complete understanding of what the General Assembly intended when it enacted particular legislation. *Id.; Ridge Heating, Air Conditioning & Plumbing v. Brennen,* 366 Md. 336, 350–51, 783 A.2d 691 (2001); *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993). "We may also consider the particular problem or problems the legislature was addressing, and the objective it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Dep't of Employment and Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). "This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense." *Adamson,* 359 Md. at 252, 753 A.2d 501.

In the case at hand, our analysis begins with the statutory language itself, which provides:

(a) If an injured person receives a written offer from a motor vehicle insurance liability insurer or that insurer's authorized agent to settle a claim for bodily injury or death, and the amount of the settlement offer, in combination with any other settlements arising out of the same occurrence, would exhaust the bodily injury or death limits of the applicable liability insurance policies, bonds, and securities, the injured person shall send by certified mail, to any insurer that provides uninsured motorist coverage for the bodily injury or death, a copy of the liability insurer's written settlement offer.

(b) Within 60 days after receipt of the notice required under subsection (a) of this section, the uninsured motorist insurer shall send to the injured person:

(1) written consent to acceptance of the settlement offer and to the execution of releases; or

(2) written refusal to consent to acceptance of the settlement offer.

(c) Within 30 days after a refusal to consent to acceptance of a settlement offer under subsection (b)(2) of this section, the uninsured motorist insurer shall pay to the injured person the amount of the settlement offer.

(d)(1) Payment as described in subsection (c) of this section shall preserve the uninsured motorist insurer's subrogation rights against the liability insurer and its insured.

(2) Receipt by the injured person of the payment described in subsection (c) of this section shall constitute the assignment, up to the amount of the payment, of any recovery on behalf of the injured person that is subsequently paid from the applicable liability insurance policies, bonds, and securities.

(e) The injured person may accept the liability insurer's settlement offer and execute releases in favor of the liability insurer and its insured without prejudice to any claim the injured person may have against the uninsured motorist insurer:

(1) on receipt of written consent to acceptance of the settlement offer and to the execution of releases; or

(2) if the uninsured motorist insurer has not met the requirements of subsection (b) or subsection (c) of this section.

 This statute sets forth the settlement procedure for claims pertaining to the uninsured motorist coverage provided by § 19–509 of the Insurance Article. The uninsured motorist provision was enacted to protect innocent victims from irresponsible drivers who drive without insurance. It is liberally construed to ensure that innocent victims of motor vehicle accidents can be compensated for the injuries they suffer as a result of such accidents. *State Farm Mut. Auto. Ins. Co. v. DeHaan,* 393 Md. 163, 194, 900 A.2d 208 (2006).

The specific provisions of § 19–511(b) at issue in this case were enacted in 1995. The words of section (b) do not address whether an insured is entitled to keep the entire amount paid

to him or her by a UIM carrier when a subsequent jury verdict is less than that amount. The legislative history, however, sheds some light on the purpose of the settlement provisions. A Floor Report prepared for Senate Bill 253 provides that the bill

> contains a remedy to a problem that has existed in Maryland's tort system for some time. Currently, an injured person who makes a claim against a liability carrier for limits available under the liability policy is frequently not allowed by their uninsured/underinsured motorist carrier to give the liability carrier a full release of their claim. Therefore, if the injured person wishes to make an additional claim for their injuries against their underinsured motorist coverage, they get caught in a situation where the liability carrier will not give them the limits of the at-fault party's policy without a release and the uninsured/underinsured motorist carrier will not allow them to give a release to the liability carrier. As a result, they are unable to recover funds from either carrier. This dilemma can cause a lengthy delay in settlement.

> Senate Bill 253 would eliminate this dilemma by requiring the uninsured/underinsured motorist carrier to: (1) allow their injured insured to settle with the liability carrier and provide a release or (2) pay their injured insured themselves to fully maintain their subrogation rights against the liable party. Therefore, the injured party gets his money more quickly and the uninsured/underinsured motorist carrier would have "up front" the liability settlement.

There is nothing in the Bill File to suggest that the Legislature considered that a jury verdict could be less than the amount paid to the insured by the UIM carrier. In fact, as a Revised Fiscal Note for Senate Bill 253 indicates, the assumption clearly was that "[e]ventually the injured person's insurer would recover ... from the tortfeasor's insurer and be able to seek recovery ... from the tortfeasor's assets." Certainly, the Legislature, in enacting § 19–511, was most concerned with eliminating the lengthy delay experienced by injured

parties and it addressed this dilemma by placing the burden of protecting subrogation rights on the UIM carrier.

■ Under the statutory scheme, the UIM carrier, in order to protect its subrogation rights, must examine and evaluate the facts of the case before deciding to make a payment to the injured party in the amount of the settlement offered by the liability carrier. The UIM carrier's payment to the injured party is designed to protect the carrier's subrogation rights and is not intended to deprive insureds of the benefit of a settlement with the liability carrier. Accordingly, a subsequent jury verdict less than the payment made by a UIM carrier cannot justify a "refund" of that portion of the payment that exceeds the verdict.

Although no Maryland court has addressed this issue previously, courts in several other jurisdictions have considered it and have reached the same conclusion. In *Gusk v. Farm Bureau Mutual Insurance Co.*, 559 N.W.2d 421 (1997), the Supreme Court of Minnesota considered a case in which Farm Bureau made a substituted payment to Gusk in lieu of allowing him to settle with an underinsured motorist, in order to preserve its subrogation rights. A jury found for Gusk, but in an amount less than the insurer's substitution payment. In considering whether Farm Bureau could offset its contractual liability for UIM benefits against the amount it had paid, the Supreme Court held that it could not demand a refund of the amounts paid and that the insured did not receive an impermissible double recovery. In reaching that decision, the Supreme Court stated that "[a] substitution is a payment to the plaintiff for the protection of the insurer's potential right of subrogation; its creation was not intended to deprive insureds of the benefit of their tentative settlement bargain." *Id.* at 424.

In *Nationwide Mutual Ins. Co. v. State Farm Auto. Ins. Co.*, 973 S.W.2d 56 (1998), the Supreme Court of Kentucky considered a case in which the UIM carrier, Nationwide, substituted its policy proceeds for a liability insurer's settlement offer. After a jury awarded damages less than the

liability policy limits, Nationwide brought an action against the liability insurer, State Farm, to recover subrogation. The court held that Nationwide bore the risk of overpayment when the jury awarded damages less than the liability coverage limits and, therefore, it was not entitled to subrogation. In reaching its decision, the Kentucky court noted that if UIM coverage is to accomplish its remedial purpose, the UIM carrier's contractual subrogation right must not obstruct the UIM's right to settle for the policy limits, even if that means releasing subrogation. The remedial purposes of the statutory scheme are accomplished when

> the plaintiff can receive the amount of the tortfeasor's policy limits, either from the liability carrier or from the UIM carrier without having to obtain a judgment. The tortfeasor has an incentive to settle, in that he may obtain a release from further liability, and the tortfeasor's liability carrier protects itself from a bad faith action by making the offer for policy limits. The plaintiff can then proceed against the UIM carrier and the UIM carrier can preserve its right of subrogation. . . . [Bearing] the risk of overpaying the plaintiff . . . encourages the UIM carrier to make an informed decision as to whether its subrogation rights are valuable or simply illusory. Since UIM benefits are payable only when the tortfeasor's liability exceeds the tortfeasor's policy limits, the UIM carrier must determine the value of the plaintiff' claim and the value of the potential subrogation claim when the liability carrier has offered the policy limits. The UIM carrier must determine, before it substitutes payment, the strength of the plaintiff's claim, the extent of the plaintiff's damages and the likelihood of being reimbursed by the tortfeasor for UIM benefits.

*Id.*, 973 S.W.2d at 57–58.

Regarding who should bear the risk of loss, the Kentucky court went on to say:

> [A] substitution by the UIM of the amount offered in settlement does not truly result in a settlement. The tortfeasor remains in a position of potential liability should the judgment exceed the amount of his policy limits. Fur-

ther, should the tortfeasor refuse to settle, instead of going to trial, the jury could absolve him or her of liability or adjudge the liability to be less than the policy limits. Thus, if the UIM carrier can substitute its payment without any risk, then the tortfeasor may be in a better position if he does not make a settlement offer at all to the plaintiff. With the risk of a bad decision on the UIM carrier, the UIM carrier is forced to make an informed decision and a realistic assessment of the offer. Further, it promotes finality between the plaintiff and the tortfeasor when the UIM carrier decides that its subrogation right has no value.

\* \* \*

[T]he UIM carrier must determine its own destiny: if it chooses to substitute payment based on the risk of evaluation of the liability carrier, it is bound by that assessment when the time to assert its subrogation rights arrives. *Id.* at 58.

Similarly, in *USAA Casualty Ins. Co. v. Kramer*, 987 S.W.2d 779 (Ky.1999), the Supreme Court of Kentucky held that a UIM carrier was not entitled to reimbursement from the insured or the liability insurer of $50,000 that was advanced to the insured after the liability insurer offered that amount in settlement even after a jury found that the defendant/motorist was not negligent for striking the insured's automobile. Relying on *Nationwide*, 973 S.W.2d 56 (1998), the court held that "[t]he bottom line is that the UIM bears the risk when it chooses to thwart a proposed settlement between the plaintiff and the alleged tortfeasor by substituting payment of the settlement amount." *Id.* at 783.

In *Connelly v. McVeigh*, 374 N.J.Super. 159, 863 A.2d 1085 (2005), the Superior Court of New Jersey held that a UIM carrier that refused to consent to an insured's settlement with an alleged tortfeasor and substituted payment was not entitled to the money after a jury determined that the alleged tortfeasor was not liable. The Court reasoned that the insurer owed the substituted payment to the insured "as the price of preserving its own subrogation rights against [the alleged

tortfeasor], and not as a measure of [the insured's] damages.'....[The UIM] nonetheless remains obligated for the payment it made to preserve its own right of subrogation. That payment was due as a consequence of its refusal to allow plaintiff to accept the [liability insurer's] settlement." *Id.* at 171, 863 A.2d 1085.

■ We find the reasoning in these cases to be persuasive. Thus, we hold that when a UIM chooses to thwart a proposed settlement between a plaintiff and an alleged tortfeasor by substituting payment of the settlement amount, it bears the risk that a jury might return a verdict in an amount less than the amount advanced or in favor of the defendant(s) and it is not entitled to a refund of any amount paid.

## II.

■ Appellant next contends that even if the statute does not allow for the return of the substituted payment, appellee is required by the language of the UIM provisions of her insurance policy to return the funds. Specifically, appellant points to the following language from appellee's insurance policy:

PART F GENERAL PROVISIONS

\* \* \*

OUR RIGHT TO RECOVER PAYMENT

\* \* \*

If we advance payment to the insured in the amount equal to the tentative settlement within thirty (30) days after written refusal to consent to the acceptance of the settlement offer:

1. That payment will be separate from any amount the "insured" is entitled to recover by the provisions of the Uninsured Motorists Coverage; and

2. We also have the right to recover the advance payment.

Appellee contends that the language of subsection 2 is vague and unenforceable, and we agree. ..

Contractual language is considered ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999); *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 596, 578 A.2d 1202 (1990). In determining whether language is susceptible of more than one meaning, courts are not precluded from considering "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985). If ambiguity is found to exist, then extrinsic evidence may be used to determine the parties' intent. *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995). In *Calomiris,* the Court of Appeals recognized that the question of whether a contract is ambiguous ordinarily is a question of law. *Calomiris,* 353 Md. at 434, 727 A.2d 358. The Court explained:

> [T]he determination of ambiguity . . . is subject to *de novo* review by the appellate court. . . . [T]he review is essentially a "paper" review where the same contractual language is before the appellate court as was before the trial court. Since neither the credibility of witnesses nor the evaluation of evidence, other than the *written* contract, is in issue, the policy reasons behind deferring to the trial judge under the clearly erroneous standard are inapplicable.

*Id.,* 353 Md. at 434–35, 727 A.2d 358. On appeal, therefore, we determine whether the trial court was legally correct.

Appellant argues that, pursuant to Section III, Part F, subsection 2 of the insurance policy, it is entitled to recover from Chamberlin the funds advanced to her in excess of the jury's verdict. Specifically, that provision provides that appellant has "the right to recover the advance payment." That language, however, does not specify from whom appellant may recover advance payments. A reasonably prudent person might read the policy language as implying that the insurer has a right to recover advanced payments from the insured, but that is not specifically stated. A reasonably prudent person might also read that language as implying that the

insurer has a right to recover from the tortfeasor or the tortfeasor's insurer.

Moreover, the interpretation argued by appellant is at odds with the purpose of § 19–511(b) and the following language contained in the policy issued to Chamberlin pertaining to the duties of a person seeking UIM coverage:

ADDITIONAL DUTY

A person seeking Uninsured Motorists Coverage must

\* \* \*

3. Allow us to advance payment to that "insured", within 30 days after the written refusal to consent to acceptance of the settlement offer, in an amount equal to the tentative settlement **to preserve our rights against the insurer, owner or operator of such "uninsured motor vehicle."**

(Emphasis added).

Since the contractual language lacks the necessary clarity and definiteness that are required for a contract to be enforceable, we conclude, as did the trial court, that Chamberlin is not obligated to return any portion of the $20,000 advanced to her by appellant.

**JUDGMENT AFFIRMED; APPELLEE'S REQUEST TO HAVE SPECIFIC PRINTING COSTS ASSESSED AGAINST APPELLANT IS DENIED; ALL OTHER COSTS TO BE PAID BY APPELLANT.**