940 A.2d 199

**ESSEX CORPORATION**

v.

**SUSAN KATHARINE TATE BURROWBRIDGE, LLC, et al.**

No. 27 Sept. Term, 2007.

Court of Special Appeals of Maryland.

Jan. 31, 2008.

**20**

Mark D. Gately (Scott R. Haiber, Hogan & Hartson, LLP, Baltimore and Jessica L. Ellsworth, Washington, DC), all on brief, for appellant.

Gerald W. Heller (Bradford F. Englander, Jennifer D. Larkin, Linowes & Blocher, LLP, on brief), Bethesda, for appellees.

Panel: DEBORAH S. EYLER, WOODWARD and JOSEPH F. MURPHY, JR.,* JJ.

---

* Joseph F. Murphy, Jr., now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of

DEBORAH S. EYLER, Judge.

In the Circuit Court for Anne Arundel County, The Susan Katharine Tate Burrowbridge, LLC, The Elizabeth Tate Winters, LLC, and The Andrew Patrick Tate, LLC (collectively, "Tate"), the appellees, sued Essex Corporation ("Essex"), the appellant, for breach of contract. Essex filed a petition to compel arbitration and a motion to stay or dismiss without prejudice pending arbitration. The court denied the petition to compel arbitration and accompanying motion "without prejudice."

Essex noted an appeal, asking whether the court erred in denying its petition to compel arbitration. For the reasons that follow, we answer that question in the affirmative, and therefore shall reverse the order of the circuit court and remand with instructions.

## FACTS AND PROCEEDINGS

### *The Purchase Agreement*

On February 28, 2005, Essex entered into a 70–page "Purchase Agreement" with Tate to acquire The Windemere Group, LLC ("Windemere"), Tate's wholly owned subsidiary. The purchase price is set forth in Section 2.2 of the Purchase Agreement. At Section 2.2(a), the Purchase Agreement states that the purchase price will be comprised of several elements, the last of which is payment on May 31, 2006, of an "Earn Out (as defined in Section 1 . . .), less any amounts for which [Essex] exercises its right of offset pursuant to Section 12 of this Agreement."

The definition of "Earn Out" is:

[T]he sum derived by multiplying each dollar of EBITDA earned during the period March 1, 2005 through February 28, 2006 in excess of Five and a Half Million Dollars ($5,500,000) by the number ten (10); provided that in no

---

this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

event will the Earn Out exceed the sum of Thirty Million Dollars ($30,000,000) plus the amount of any offsets allowed the Purchaser under Section 12. For purposes of allocating the Earn Out, the Purchaser shall not allocate to [Windemere] or its Subsidiaries any additional or different expense items which are outside of the historic level of general and administrative expenses reflected in the Financial Statements, except for rent expense. . . .

Section 1.1. "EBITDA" is "the consolidated earnings of [Windemere] and its Subsidiaries before interest, taxes, depreciation and amortization, calculated in accordance with [generally accepted accounting principles in the United States]." *Id.*

Section 12 of the Purchase Agreement, entitled "Purchaser's Right of Offset," grants Essex "the right and option, but not the obligation, to offset and reduce the Earn Out" by certain sums more specifically described in subsections (a), (b), (c), and (d).[1] As pertinent to this appeal, Section 12 goes on to state:

Before [Essex] exercises any right of offset it shall provide [Tate] with written notice of the amount of the claim and its intention to exercise its right of offset. [Tate] shall have fifteen (15) days from receipt of [Essex's] notice to accept or reject the amount claimed by [Essex]. If [Tate] accept[s] the amount claimed by [Essex], [Essex] may exercise its right of offset under this Section 12. If [Tate] rejects the amount claimed by [Essex], [the parties] shall seek in good faith to resolve any differences they have with respect to the claim and offset amount during the fifteen (15) day period following [Tate's] rejection of [Essex's] claim. *If the dispute is not resolved to the mutual satisfaction of [Essex]*

---

1. In particular, (a) by the amount of any accounts receivable, other than those excluded by agreement, which were in existence on February 28, 2006, but were not collected before May 31, 2006; (b) "by the amount of any indemnity or reimbursement due to [Essex] for any Taxes under Section 7.4(a)"; (c) by any obligation of [Windemere] or its subsidiaries arising out of certain government contracting matters as set forth in Section 3.22(a) of the Purchase Agreement; and (d) "by any indemnity amount owed by [Tate] to [Essex]" under the "Indemnification" section of the Purchase Agreement.

*and [Tate] within such fifteen (15) day period, each party shall have the right to require that the dispute be submitted to arbitration before one (1) arbitrator selected jointly by the parties, applying such arbitration rules as the parties mutually agree, and if they cannot agree, applying the Commercial Rules of the American Arbitration Association ("AAA") without the need to institute an AAA proceeding. The ruling of the arbitrator shall be final and binding on all parties hereto, and may be entered as a judgment in any court of competent jurisdiction.... In the event [Tate] reject[s] any amount claimed by [Essex] hereunder, or in the event of any dispute regarding the Earn Out, [Essex] shall have the right to retain and withhold the portion of the Earn Out equal to the amount of the disputed claim until the question of entitlement of [Tate] to delivery of all or a portion of such withheld amount of the Earn Out shall have been determined by (i) an agreement in writing executed by the [parties] or (ii) a final judgment of an arbitrator chosen in accordance with this Section 12....*

(Emphasis added.)

Finally for our purposes, the Purchase Agreement includes at Section 11.2 a provision governing "Post–Closing Maintenance of and Access to Information." It states, in pertinent part:

(a) The Parties acknowledge that after Closing each Party may need access to information or documents in the control or possession of another Party for the purposes of concluding the transactions herein contemplated, preparing Tax Returns or conducting Tax audits, obtaining insurance, complying with Legal Requirements, and prosecuting or defending third party claims. Accordingly, each Party shall keep, preserve and maintain in the ordinary course of business, and as required by Legal Requirements, all books, records, documents and other information in the possession or control of such Party and relevant to the foregoing purposes at least until the expiration of any applicable statute of limitations or extensions thereof.

(b) Each party shall cooperate fully with, and make available for inspection and copying by, the other Party, its employees, agents, counsel and accountants and/or Governmental Authorities, upon written request and at the expense of the requesting Party, such books, records documents and other information to the extent reasonably necessary to facilitate the foregoing purposes. In addition, each Party shall cooperate with, and shall permit and use reasonable commercial efforts to cause its former and present members, managers, directors, officers and employees to cooperate with, the other Party on and after Closing in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to the subject matters of this Agreement.

(c) The exercise by any Party of any right of access granted herein shall not materially interfere with the business operations of the other Party.

### *Events Post–Closing and Prior to Litigation*

Closing went forward as scheduled on February 28, 2005. The first part of the purchase price, $44,157,000, was paid that day. That and the other parts of the purchase price except the Earn Out were paid as required and are not in dispute.

Fourteen months after the closing, on April 18, 2006, Essex retained an independent accounting firm to calculate the Earn Out that was due to be paid on May 31, 2006.

On May 5, 2006, Tate, by counsel, wrote to Leonard E. Moodispaw, President and Chief Executive Officer of Essex, stating that, based upon calculations made by accountants for Essex "every month during the period of the Earn Out," "the EBITDA achieved by Windemere has exceeded $11.3 million for the 12–month period ended [sic] February 28, 2006." That figure, counsel went on to observe, was greater than the EBITDA figure of $8,500,000 that "would provide the maximum Earn Out payment" of $30,000,000, under Section 1.1. In closing, counsel for Tate stated, "On behalf of the Sellers, I

respectfully request that you confirm, in writing, your intent to pay the full $30,000,000 Earn Out on May 31, 2006."

That letter prompted a written response from Mr. Moodispaw, on May 17, 2006, in which he pointed out that the demand was premature, that Essex had retained an independent accountant to determine the Earn Out amount, and that he (Mr. Moodispaw) did not agree with certain comments by counsel for Tate about how the Earn Out was to be computed under the Purchase Agreement.

By letter of May 31, 2006, Mr. Moodispaw notified counsel for Tate that the Earn Out had been calculated as follows: "Using the agreed upon definitions in the Purchase Agreement and using the agreed upon EBITDA methodology set forth in the Purchase Agreement, we then took the allowable off-sets, as referenced in my letter of May 17, 2006 to arrive at the final Earn–Out amount of $13,123,966." The letter explained, in some general and some specific terms, how the Earn Out was computed, and attached a statement spelling out the precise calculations. The letter informed counsel for Tate that the $13,123,966 Earn Out amount had been wired to his client that day.

The next day, counsel for Tate responded by letter, taking issue with Essex's calculation of the Earn Out and demanding the maximum Earn Out payment of $30,000,000. In the letter, counsel went on to demand that Tate be given "a complete copy of the financial information, financial models and workpapers utilized" by Essex's accountant as well as "full access, via computer log in and read access to all files, to all cost records and all financial reports relating to the Windemere Operations and Essex Corporate G & A [General and Administrative Accounts]." Counsel opined that access to the requested information "is required . . . pursuant to Section 11.2 of the Purchase Agreement" and closed by warning that Tate "ha[s] instructed . . . that if such information is not made available promptly, [it is] prepared to institute legal proceedings to fully enforce the terms of the Purchase Agreement."

There followed a series of letters and exchanges of documents between counsel for the parties, from June 7, through August 8, 2006. They were not able to resolve their dispute over the amount of the Earn Out or about the documents needed in order to determine the amount of the Earn Out.

## *The Litigation*

On September 15, 2006, Tate filed the instant suit. Its complaint sets forth two counts for breach of contract. In Count I, it seeks access to documents and other materials pursuant to Section 11.2 of the Purchase Agreement. In Count II, it alleges that Essex has "failed to pay [Tate] the full amount of the Earn Out," pursuant to Section 2.2 of the Purchase Agreement.

In response to the complaint, Essex filed a petition to compel arbitration, invoking Section 12 of the Purchase Agreement, and a motion to stay or dismiss without prejudice pending arbitration. Tate filed an opposition.

On February 7, 2007, the court held a hearing on the petition to compel arbitration and motion to stay or dismiss. The court ruled as follows:

Well, let me thank you both counsel for presenting what I think is kind of a close question. Efficiently, the Court is going to deny the Motion without prejudice because I believe I think that [counsel for Tate] has the better part of the argument, especially as to what I will refer to as the discovery provisions of the contract.

It seems to me that with equal priority, it has a paragraph, a section of its own. There is the provision to the effect that [Tate] should have the opportunity to make a full inspection of all the books upon which the ABITA [sic], or however we pronounce that, the earn out provisions are made. And for the purpose of a motion to dismiss, the only facts that the Court can take into account are the facts in the pleadings, and I am to construe those in the light most favorable to the non-moving party.

And construing them in the light most favorable—there are no affidavits, we are not on summary judgment—I have to, I think, find that the allegation by [Tate] is sufficient to indicate that [it] ha[s] not had compliance with [the] other contractual provision to give [it] full access to all those records. If there were full compliance with it or if we had affidavits on a summary judgment, that either created a dispute of fact or didn't, it might be another matter.

But at this point in the absence of that, I think that [Tate] could be prejudiced by an immediate referral to arbitration. And so the most relief that the Court might give was after there was compliance with the discovery provision, then, perhaps, the Court would refer [the parties to arbitration] but not at this time, because I think that otherwise would be depriving [Tate] of the benefit of the agreement. And the agreement says nothing about discovery via arbitration or about arbitrating the discovery provisions.

When counsel for Essex asked for clarification as to whether the petition to compel arbitration was or was not being denied, the court responded, "It is, in effect, denied without prejudice to bringing it back after the discovery is completed. But perhaps if discovery is completed, you might be able to work something out."

A written order denying the petition to compel arbitration and motion to dismiss or stay was entered on February 9, 2007. Essex filed a notice of appeal on March 7, 2007.

We shall include additional facts as pertinent to our discussion of the issues.

## DISCUSSION

Essex contends that the court erred as a matter of law in denying its petition to compel arbitration. It maintains that the entire dispute between the parties concerning the proper calculation of the Earn Out, and the exchange of information pertinent to that dispute, is subject to arbitration under Section 12 of the Purchase Agreement; and if there is any ambiguity about whether the arbitration clause in that section

covers the entire dispute, that is an issue for the arbitrator, not the court, to decide. Thus, in either situation—that the Purchase Agreement plainly requires arbitration or that it is unclear whether the Purchase Agreement requires arbitration—the court erred in denying the petition to compel arbitration.

Tate counters first that this Court lacks jurisdiction because the appeal is taken from a non-appealable interlocutory order. Second, and in the alternative, it argues that the language of Section 12 of the Purchase Agreement does not require arbitration of the disputes in either count of the complaint, and therefore the court properly denied the petition.

Essex replies that the circuit court's order denying the motion to compel is appealable and therefore this Court does not lack jurisdiction.

### Is the Circuit Court's Order Denying Essex's Motion to Compel Arbitration Appealable?

Tate maintains that the circuit court's order denying Essex's petition to compel arbitration is not appealable because it is not a final judgment, within the meaning of Md.Code (1973, 2006 Repl. Vol.), section 12–301 of the Courts and Judicial Proceedings Article ("CJ"), or an appealable interlocutory order, under CJ section 12–303, and the circuit court did not certify that there was no just reason for delay, pursuant to Rule 2–602(b).

The resolution of this jurisdictional issue is governed by *Town of Chesapeake Beach v. Pessoa Constr. Company, Inc.*, 330 Md. 744, 625 A.2d 1014 (1993), and *NRT Mid–Atl. Inc. v. Innovative Props., Inc.*, 144 Md.App. 263, 797 A.2d 824 (2002).

The *Pessoa* case was a dispute between a contractor and a town that arose out of their construction contract, which contained a binding arbitration clause. The contractor sued the town for breach of contract, misrepresentation, and conspiracy, and filed a motion to stay pending arbitration. The town opposed the motion on the ground that the contractor had lost its right to arbitrate, by delay. The court granted the

motion to stay, and the contractor then filed its demand for arbitration. The town filed a petition to stay arbitration, in the circuit court action, which the contractor opposed. The circuit court ruled that the demand for arbitration was timely, and therefore the contractor had not waived arbitration. On that basis, it denied the town's petition to stay arbitration.

The town appealed, and this Court dismissed the appeal as not taken from a final judgment. On *certiorari* review, the Court of Appeals held that the order denying the petition to stay arbitration was appealable. It emphasized that a petition to stay arbitration can be brought under the Maryland Arbitration Act as a discrete claim, *see* CJ section 3–208, and observed, "[t]he relief sought by the moving party in such an action [to stay arbitration] does not bear on the merits of the underlying claim; it relates solely to the forum to be used for the resolution of that dispute." *Pessoa, supra,* 330 Md. at 751, 625 A.2d 1014. Reasoning that the town's petition to stay arbitration, although filed in the pending circuit court action between the parties, constituted a separate claim under CJ section 3–208, and that that claim had been "completely terminated" by the court's denial, the Court exercised its discretion to enter a final judgment on that claim, under Rule 8–602(e)(1).

In *NRT,* this Court applied the principle established in *Pessoa* to an interlocutory order denying a motion to compel arbitration, under CJ section 3–207(c), filed in a tort action between a listing real estate firm and a cooperating real estate firm. The firms were signatories to a contract requiring arbitration of disputes between real estate brokerages over payment of commissions. The cooperating firm's tort action was, in essence, a claim for payment of a commission on a particular transaction. The listing firm filed a motion to compel arbitration, which the court denied. In an appeal from that ruling, we held that, just as the petition to stay arbitration in *Pessoa* could have been pursued as a distinct cause of action, and had only to do with the proper forum in which to resolve the parties' dispute, the motion to compel arbitration filed by the listing firm could have been brought as a distinct

action, and had only to do with the proper forum in which to resolve the parties' dispute. On that basis, we exercised our discretion to enter a final judgment on that claim, under Rule 8–602(e)(1).

The same principle applies to the case at bar. Tate sued Essex for breach of the Purchase Agreement. Essex, contending that the parties' entire dispute is subject to arbitration, filed a motion to compel arbitration in the contract action. Essex could have filed a separate action to compel arbitration, under CJ section 3–207; and if the court had ruled against it in that action, it could have taken an appeal from that final judgment. Whether Essex's petition to compel arbitration was brought separately or was raised as a motion in the pending contract action, it concerns only the proper forum in which to resolve the parties' disputes, and its denial is a proper subject of appeal at this juncture. Under the authority of *Pessoa* and *NRT*, we exercise our discretion, under Rule 8–602(e)(1), to enter a final judgment on the circuit court's arbitration ruling.

■ Tate also argues that the court's order is not final because the motion to compel arbitration was denied "without prejudice," meaning that it could be re-filed. We find no merit in this argument. To be sure, when a complaint is dismissed with leave to amend, the court's order is not a final judgment. *Walser v. Resthaven Mem'l Gardens, Inc.*, 98 Md.App. 371, 379–80, 633 A.2d 466 (1993). The reason such an order is not final is that it allows the plaintiff to make changes or additions to his complaint so as to cure its deficiencies. In the case at bar, the court's grant to Essex of leave to re-file its motion to compel arbitration did not have the same effect. As we explain below, to properly rule on Essex's motion to compel arbitration, the court had to decide then and there whether the parties' disputes were subject to arbitration. If so, it was required to compel arbitration so the parties' disputes would be pursued and resolved in the proper forum, *i.e.*, the one the parties had contracted for. Denying the motion to compel arbitration without prejudice to re-file

the same motion at a later date was tantamount to an unqualified denial. Because there was nothing Essex could furnish the court on the issue of arbitration, beyond what already was before it, the denial allowed the case to remain in the judicial forum.

### Did the Circuit Court Err as a Matter of Law in Denying Essex's Motion to Compel Arbitration?

The existence *vel non* of an agreement by parties to arbitrate a dispute is a question of contract interpretation, and therefore an issue of law. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 346 Md. 122, 127, 695 A.2d 153 (1997); *Brendsel v. Winchester Constr. Co., Inc.*, 162 Md.App. 558, 573, 875 A.2d 789 (2005), *aff'd*, 392 Md. 601, 898 A.2d 472 (2006). We review decisions on issues of law *de novo*. *City of Bowie v. MIE, Props., Inc.*, 398 Md. 657, 677, 922 A.2d 509 (2007).

Maryland follows the objective rule of contract interpretation, the goal of which is to determine and make effective the parties' intentions. *Weaver v. ZeniMax Media, Inc.*, 175 Md.App. 16, 50, 923 A.2d 1032 (2007). The principal evidence of the parties' intentions is the language of their contract, as it is presumed that the parties intended what they wrote. *Id.* In the context of appellate review of a circuit court decision as to whether a contract between parties includes an agreement to arbitrate certain disputes, this Court has said:

> "A fundamental principle of contract interpretation is to ascertain and effectuate the intention of the parties." The language of the contract itself is the primary source for determining the parties' intentions. If the language of a contract is clear, "it must be presumed that the parties meant what they expressed." The "clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean." Rather, "the true test of what is meant is ... what a reasonable person in the position of the parties would have thought" the contract meant.

*Soc'y of Am. Foresters v. Renewable Natural Res. Found.,* 114 Md.App. 224, 234–35, 689 A.2d 662 (1997) (citations omitted).

Whether particular language in a contract is ambiguous is itself a question of law that an appellate court reviews expansively. *Ohio Cas. Ins. Co. v. Chamberlin,* 172 Md.App. 229, 241, 914 A.2d 160 (2007). Language is ambiguous when it can be reasonably understood to have more than one meaning. *Id.* When the meaning of contract language is objectively unclear, evidence may be taken for the fact-finder to consider in deciding what the parties intended the language in question to mean. *Id.*

"[T]he role of the court in deciding a motion to compel arbitration is limited to determining one question: '[I]s there an agreement to arbitrate the subject matter of a particular dispute?'" *Allstate Insurance Co. v. Stinebaugh,* 374 Md. 631, 642, 824 A.2d 87 (2003) (quoting *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 103–04, 468 A.2d 91 (1983)); *see also Nowak v. NAHB Research Ctr., Inc.,* 157 Md.App. 24, 33, 848 A.2d 705 (2004). In ascertaining the scope of an arbitration clause, the court must find "reliable evidence from the language actually employed in the contract that the parties intended the disputed issue to be the subject of arbitration, the intent of the parties being the controlling factor." *NRT Mid–Atl., Inc., supra,* 144 Md.App. at 280, 797 A.2d 824 (quoting *Joseph F. Trionfo & Sons, Inc. v. Ernest B. LaRosa & Sons, Inc.,* 38 Md.App. 598, 605, 381 A.2d 727 (1978)).

When "it is apparent … that the issue sought to be arbitrated lies beyond the scope of the arbitration clause, the opposing party should not be compelled to submit to arbitration, since there is no agreement to arbitrate." *Bel Pre Med. Ctr., Inc. v. Frederick Contractors, Inc.* 21 Md.App. 307, 321, 320 A.2d 558 (1974); *aff'd,* 274 Md. 307, 334 A.2d 526 (1975); *see also Gold Coast Mall, Inc., supra,* 298 Md. at 104, 468 A.2d 91. Conversely, when the plain language of an arbitration clause covers the issue in dispute, the court must compel arbitration. *Gold Coast Mall, Inc., supra,* 298 Md. at 104, 468 A.2d 91; *Bel Pre Med. Ctr., supra,* 21 Md.App. at 321,

320 A.2d 558. When the parties have agreed to arbitrate, but the scope of the arbitration clause is unclear, so it is not evident whether their dispute is or is not subject to arbitration, the arbitrator, not the court, must resolve the ambiguity. *Contract Constr., Inc. v. Power Tech. Ctr. Ltd. P'ship*, 100 Md.App. 173, 178, 640 A.2d 251 (1994). Accordingly, "it is only when the matter in dispute is unequivocally outside the scope of the arbitration clause that a motion to compel arbitration may be denied and litigation be allowed to proceed." *Id.* at 178–79, 640 A.2d 251.

In the case at bar, the arguments of the parties focus, as they must, on the language of the Purchase Agreement, particularly Section 12 and the definition of "Earn Out," in Section 1.1. As explained above, as defined in the Purchase Agreement, the Earn Out is a sum equal to the amount of the EBITDA over $5.5 million, times 10 (but no more than $30 million), minus the amount of the offset taken under Section 12. Thus, to compute the Earn Out, the EBITDA (defined, as we have stated, in Section 1.1) and the offset must be determined and inserted into the formula.

Essex argues that the parties' disputes, both over the $13,123,966 dollars it paid as the Earn Out on May 31, 2006, and over the documents necessary to calculate the EBITDA and the offset, are subject to arbitration under the "any dispute regarding the Earn Out" language in Section 12. That language, in its chronologically ordered context, is:

1. "Before [Essex] exercises any right of offset it shall provide [Tate] with written notice of the amount of the claim and its intention to exercise its right of offset."

2. "[Tate] shall have fifteen (15) days from receipt of [Essex's] notice to accept or reject the amount claimed . . . ."

3. "If [Tate] rejects the amount claimed by [Essex], [the parties] shall seek in good faith to resolve any differences they have with respect to the claim and offset amount [in the ensuing 15 days] . . . ."

4. "If the dispute is not resolved to the mutual satisfaction of [Essex] and [Tate] within [that] period, each party shall have the right to require that the dispute be submitted to arbitration...."

5. "In the event [Tate] reject[s] any amount claimed by [Essex] hereunder, *or in the event of any dispute regarding the Earn Out,* [Essex] shall have the right to retain and withhold the portion of the Earn Out equal to the amount of the disputed claim until the question of entitlement of [Tate] to delivery of all or a portion of such withheld amount of the Earn Out shall have been determined by (i) [written agreement of the parties] or (ii) a final judgment of an arbitrator chosen in accordance with this Section 12...."

(Emphasis added.)

The parties' arguments are best understood in reverse order. Tate maintains that its claim in Count I, for breach of contract based on Essex's failure to respond to numerous requests for documents to which Tate is entitled under Section 11.2, is a dispute entirely separate from any dispute between the parties under Section 12. It further maintains that its breach of contract claim in Count II is not covered by Section 12. It argues that the language of that section permits arbitration only of any unresolved dispute about the amount of the offset Essex is entitled to take, and that the parties' dispute in this case has to do with calculation of the EBITDA, not with calculation of any offset. In support of its position that the arbitration right created by Section 12 is narrowly circumscribed, Tate points out that the right is not established in Section 1, in which "EBITDA" and "Earn Out" are defined, or in Section 2.2, which addresses the purchase price, including the Earn Out component, but in Section 12, which, as its title makes plain, concerns only the right of offset.

Essex argues to the contrary that the "in event of any dispute regarding the Earn Out" clause in Section 12 gives it the right to have any dispute about the Earn Out decided by arbitration. It maintains that, whether the parties' dispute is

over the correct EBITDA figure or the correct offset figure, both of which are necessary to compute the final Earn Out that must be paid, or about entitlement to documents and/or information used or needed to calculate either of those figures, the dispute is "regarding the Earn Out" and is therefore subject to arbitration. Essex argues in the alternative that if it is not clear whether Section 12 creates a right to arbitrate any dispute about any part of the calculation of the Earn Out, or the entitlement to documents about components of the Earn Out, under Section 11.2, arbitration still should have been compelled for the arbitrator to resolve the ambiguity.

We first address Section 12. Reduced to its relevant and essential parts, that section provides, in the "If the dispute is not resolved . . ." sentence, that if the parties do not agree on the offset amount, each has the right to submit the dispute about the offset amount to arbitration. That language clearly and expressly creates a right to arbitrate any dispute about the amount of offset Essex is claiming. According to Tate, however, and as evidenced by the correspondence between the parties that is part of the record, the parties' actual dispute not only concerns the offset figure but also concerns the EBITDA variable of the Earn Out formula, which is not covered by that sentence.

The "In the event any or all of the Sellers reject" sentence in Section 12 further provides, however, that if Tate rejects any offset amount Essex claims *or* if there is "any dispute regarding the Earn Out," Essex may keep "the portion of the Earn Out equal to the amount of the disputed claim" until the amount of the withheld Earn Out that Tate is entitled to receive is decided by agreement *or* by arbitration. Although less directly stated, this sentence establishes a right to arbitrate a dispute about any component of the Earn Out, which covers an EBITDA dispute.

First, by virtue of the sentence's initial "or," Essex is permitted to retain the portion of the Earn Out equal to the amount of the disputed claim in two situations: when there is an offset dispute and when there is any dispute about the

Earn Out. If Section 12 only covered offset disputes, there would be no need to include this phrase and there would be no need for the retention amount allowed to be described as a portion of the Earn Out equal to the amount of the disputed claim. With respect to the latter, given that the offset is subtracted from the sum derived by multiplying the EBITDA amount in excess of $5.5 million dollars by 10, so long as that sum is not above $30 million dollars, if the only dispute being discussed were a dispute over the offset, the withheld amount logically would be equal to the highest amount of offset being claimed. But if the dispute in question can cover any component of the Earn Out, such as the EBITDA, the amount that Essex can withhold would have to be described in terms of the portion of the Earn Out affected by the dispute. Second, the last phrase of this sentence applies to either type of dispute—one over the offset and one over the Earn Out generally. It is implicit, then, that the right of arbitration applies not only to a dispute over the offset claimed (as is expressly stated) but also to any dispute over the Earn Out.

Accordingly, Section 12 of the Purchase Agreement only can be reasonably understood to create a right to arbitrate any dispute regarding the Earn Out. Because the dispute between Essex and Tate that is the subject of Count II of the complaint plainly is a dispute regarding the Earn Out, as any dispute over the EBITDA and/or the offset is a dispute regarding the Earn Out, Essex was entitled to have that dispute submitted to arbitration, and the court erred by not granting Essex's motion to compel in that respect.

The court further erred by refusing to compel arbitration of the dispute set forth in Count I, in which Tate alleges that Essex failed to furnish it documents that Essex used in determining the EBITDA variable and in computing the Earn Out, including the offset deducted from the Earn Out. The parties' dispute about the documents required to be furnished by Essex to Tate for this purpose also clearly is a dispute "regarding the Earn Out," which, pursuant to Section 12, is subject to arbitration.

 The court strayed from the task before it in ruling that the dispute would remain in the circuit court so Tate could make use of the discovery tools available in chapter 400 of the rules of civil procedure to obtain pertinent documents and other information. As explained above, the circuit court's role in ruling on a petition to compel arbitration is limited to deciding whether there is an agreement between the parties to arbitrate the subject matter of their dispute. *Gold Coast Mall, Inc., supra,* 298 Md. at 103–04, 468 A.2d 91. In this case, the court should have answered that question in the affirmative as to both counts of Tate's complaint; it should not have kept an arbitrable dispute in circuit court for purposes of discovery. To the extent that discovery is permitted in a circuit court action in which a party has petitioned the court to compel arbitration of the parties' disputes, the discovery has to relate to the existence and scope of any arbitration agreement. *Nowak, supra,* 157 Md.App. at 38–39, 848 A.2d 705. Here, the discovery Tate was seeking related to the substance of the parties' disputes, not to the existence and scope of their arbitration agreement.[2]

**ORDER REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH INSTRUCTIONS TO ENTER ORDER COMPELLING ARBITRATION. COSTS TO BE PAID BY THE APPELLEE.**

---

**2.** We note that the arbitration agreement set forth in Section 12 of the Purchase Agreement calls for the arbitration to apply such rules as the parties shall agree or, if they cannot agree, the Commercial Rules of the American Arbitration Association ("AAA"). The AAA Commercial Arbitration Rules contain their own discovery provisions. *See* Commercial Arbitration Rules and Mediation Procedures, R–21 (2007), *available at* http://www.adr.org/sp.asp?id=22440.